## TABLE OF CONTENTS

**PAGE**

**TABLE OF AUTHORITIES** ................................................................................................ i

**I.   FACTUAL BACKGROUND** ............................................................................... **1**

**III.  ARGUMENT** ................................................................................... **8**

    A.    Defendant has Not Presented a Meritorious Defense and Default Judgment Should Not be Vacated ................................................................................. 9

        1.    Defendant's First Affirmative Defense is Improperly Pled ................... 10

        2.    Defendant's Second, Third, Sixth, Seventh, Eighth, Ninth, Eleventh and Fifteenth Affirmative Defenses are Not Meritorious and do Not Support a Finding to Vacate Default Judgment ............................................. 12

            a.    Defendant's Second Affirmative Defense: Plaintiff's Claims are Time-barred and/or have Lapsed ...................................... 12

            b.    Defendant's Third Affirmative Defense: Plaintiff Lacks Standing ................................................................ 12

            c.    Defendant's Sixth and Seventh Affirmative Defenses: Plaintiff's Causes of Action are Barred by Res Judicata and Collateral Estoppel, Respectively ................................................. 13

            d.    Defendant's Eighth and Ninth Affirmative Defenses: Plaintiff's Causes of Action are Barred by Judicial Estoppel and Equitable Estoppel, Respectively ............................................... 13

            e.    Defendant's Eleventh Affirmative Defense: Plaintiff is Barred from Asserting Claims against Defendant which have already been Released or Otherwise Waived ...................................... 14

            f.    Defendant's Fifteenth Affirmative Defense: Plaintiff's Action is Barred by Mandatory Arbitration and/or Mediation Provisions ............................................................... 15

        3.    Defendant's Fourth, Fifth, Tenth, Twelfth, Thirteenth and Fourteenth Affirmative Defenses are Bland, Generic and Generally Misapplied ................................................................ 15

            a.    Defendant's Fourth Affirmative Defense: Plaintiff's Action is Barred

               by the Doctrine of Laches...................................................15

b.    Defendant's Fifth Affirmative Defense: Plaintiff's Action is Barred by the Doctrines of In Pari Delicto and Unclean Hands.......................................................................16

c.    Defendant's Tenth Affirmative Defense: Plaintiff's Action is Barred by the One-Satisfaction Rule..............................................16

d.    Defendant's Twelfth Affirmative Defense: Plaintiff's Action is Subject to Set Off and/or Recoupment...................................16

e.    Defendant's Thirteenth Affirmative Defense: Plaintiff is Barred from Bringing this Action because it Breached the Implied Covenant of Good Faith and Fair Dealing..............................................17

f.    Defendant's Fourteenth Affirmative Defense: Plaintiff has No Contractual Right to Payment.........................................17

4.    Defendant's Defense that the Audit Delinquencies are Based on Non-Union Employees is Insufficient to Support a Find to Vacate Default Judgment....................................................................18

5.    There are Only Three Valid Defenses to a Suit for the Collection of Delinquency Contributions under ERISA and Defendant Fails to Assert any of them.....................................................................19

B.    **PREJUDICE TO THE PENSION FUND**.......................................... 20

C.    **DEFENDANT HAS NOT DEMONSTRATED EXCUSABLE NEGLECT...20**

III. **CONCLUSION** ................................................................................ **20**

# TABLE OF AUTHORITIES

## FEDERAL CASES

Agathos v. Starlite Motel, 977 F.2d 1500 (1992) ………………………………………………19

Burka v. Aetna Life Ins. Co., 56 F.3d 1509 (D.C.C.1995). ……….………………………15

Central States, Southeast & Southwest Areas Pension Fund, v. Behnke, Inc.,
    883 F.2d 454   (6th Cir. 1989)………………… ………………………….……………13

Compton v. Alton Steamship Company, Inc., 608 F. 2d 96 (1969)………………………………9

Foltz v. U.S. News and World Report, Inc. 627 F.Supp. 1143 (D.D.C. 1986)……………….12

Grant v. U.S. News and World Report, Inc., 639 F.Supp. 342 (D.D.C. 1986)……………….12

H. F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe, 432 F.2d 689
    (D.C. Cir. 1970). ………………………………………………………………………20

Harris v. District of Columbia, 159 F.R.D. 315 (D.D.C. 1995)…………………………………..9

Holliday v. Duo-Fast Maryland Co., 905 F2d 1525 (4th Cir. 1990)………………………..…20

Huge v. Long's Hauling Company, 590 F.2d 457 (3d Cir. 1978)………………………………20

I.A.M. Nat. Pension Fund, Ben. Plan A v. Industrial Gear Mfg. Co., 723 F.2d 944
    (D.C.C. 1983)……………………………………………………………………………..13

In re Worldwide Web Sys., Inc., 328 F.3d 1291 (11th Cir. 2003)……………………………..…20

In re: U.S. Office Products Co., 251 F. Supp. 2d 77 (D.D.C. 2003)……..…………………….10

Independent Bankers Ass'n v. Heimann, 627 F.2d 486 (D.C.C.1980)………………………………15

International Painters and Allied Trades Union and Industry Pension Fund v. H.W. Ellis Painting,
    Co., Inc., 288 F.Supp.2d 22 (D.D.C. 2003)……………………………………………………9

Jackson v. Beech, 636 F.2d 831 (D.C. Cir. 1980). ……………………………………………..…8

Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 102 S.Ct. 851(1982) ……………………………..19

Kassman v. American University, 546 F.2d 1029 (D.C.Cir. 1976). …………………………16

Keegel v. Key West & Carribbean Trading Co., 627 F.2d 372 (D.C. Cir. 1980). ………………8

Konstantinidis v. Chen, 626 F.2d 933 (D.C 1980). ...................................................13,14

Ladder Man, Inc. v. Manufacturer's Distribution Svcs. Inc., 2000 U.S. App. LEXIS 27982
    (6th Cir. 2000)...... ...................................................................................20

Lawler v. Gilliam, 569 F.2d 1283 (4th Cir.1978) ........................................................16

NAACP v. NAACP Legal Def. & Educ. Fund, Inc., 753 F.2d 131 (D.C.C.1985). ................15

Nashville Lodging Co. v. Resolution Trust Corp,. 59 F.3d 236 (D.C.Cir. 1995)................ ..17

Parklane Hosiery Co. v. Shore, 439 U.S. 322 (1979). ...................................................13

Robbins v. Lynch, 836 F.2d 330 (7th Cir.1988) ...........................................................13

Scarano v. Central Railroad, 203 F.2d 510 (3d Cir. 1953). .............................................14

Schneider Moving & Storage Company v. Robbins, 466 U.S. 364, 104 S.Ct. 1844 (1984).......15

Sheet Metal Workers' Int'l Ass'n, Local 206 v. West Coast Sheet Metal Co., 954 F.2d 1506
    (9th Cir. 1992). ......................................................................................19

Solorall Shade and Shutter Corp., v. Bio-Energy Systems, Inc., 803 F.2d 1130 (11th Cir. 1986).
    .......................................................................................................20

Southwest Adm'rs, Inc. v. Rozay's Transfer, 791 F.2d 769 (9th Cir.1986)..........................19

Trustees of National Automatic Sprinkler Pension Fund v. American Automatic Fire
    Protection, 680 F.Supp. 731 (D. Md. 1988). ....................................................12

Uproar v. National Broadcasting Co., 81 F.2d 373 (1st Cir.), cert. denied, 298 U.S. 670,
    56 S.Ct. 835, 80 L.Ed. 1393 (1936).................. ...................................................17

Whitaker v. District of Columbia, 228 F.R.D.378 (D.D.C. 2005). ................................... 9

## FEDERAL STATUTES AND RULES

29 U.S.C. §158(a)(3) ...............................................................................18

29 U.S.C. §1145.................................................................................11,12

ERISA § 515 ...................................................................................12,18,19

Fed. R.Civ.P.12(b)(6)……………………….……………………………………………………...10

Fed. R. Civ. P. 55(c)……………………….…………………………………………………...…9

Fed. R. Civ. P. 60(b) ...........................................................................................................8,9,21

## STATE CASES

Hais v. Smith, 547 A.2d 986 (D.C. 1988)…………………………………………………..17

Hudson v. Ashley, 411 A.2d 963 (D.C. 1980). …………………………………………...…14

Melton v. Anderson, 32 Tenn.App. 335 (Ct.App.1948). …………………………………..14

Sheriff v. Medel Elec. Co., 412 A. 2d 38 (D.C. 1980) …………………………………………13

Winston v. Mandor, 710 A.2d 835 (Del. Ch. 1997)..…………………………………………..10

## STATE STATUTES AND RULES

DC ST § 12-201 (7). …………………………………………………….………………………12

## PUBLICATIONS

Statement of Rep. Thompson, 126 Cong.Rec. 23039 (1980) ........................................................19

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND | ) ) ) |
| Plaintiff, | )CIVIL ACTION NO. 05-1662 (ESH) |
| v. | ) ) |
| THE TROAST GROUP, INC. | ) ) |
| Defendant. | ) |

**MEMORANDUM OF LAW IN RESPONSE TO DEFENDANT'S MOTION**
**TO VACATE DEFAULT JUDGMENT**

Plaintiff, International Painters and Allied Trades Industry Pension Fund ("Fund," "Pension Fund" or "Plaintiff"), by undersigned counsel, submits this Memorandum of Law in Response to Defendant's Motion to Vacate Default Judgment filed by The Troast Group, Inc. ("Troast," "Company" or "Defendant") on December 9, 2005. The Pension Fund submits that there is no factual or legal basis for the Court to grant the Defendant's Motion and, therefore, it should be denied.

**I.    FACTUAL BACKGROUND**

The Pension Fund is an "employee benefit pension plan" as defined in Section 3(2)(A)(i) of ERISA, as amended, 29 U.S.C. Section 1002(2)(A)(i), established by the International Union of Painters and Allied Trades, AFL-CIO-CFL ("the International"), and employers in private industry whose employees are members of or otherwise represented by the International and its district councils and local unions, for the purpose of providing retirement income to the employees. See, Declaration of Thomas C. Montemore[1], ¶2, attached as Exhibit 1; Complaint, ¶4. The Pension Fund is administered in the District of Columbia from its principal place of business at 1750 New York

Avenue, N.W., Washington, D.C. 20006. Id.

Defendant entered into a collective bargaining agreement ("Agreement") with International Union of Painters and Allied Trades District Council 711 ("DC 711" or "Union"), which includes within its jurisdiction the activities of International Union of Painters and Allied Trades Local Union 1976 ("Local 1976"). See, Exhibit 1, ¶3; Exhibit 2. At all times relevant to this action, Defendant was party to or agreed to abide by the terms and conditions of one or more collective bargaining agreement(s) with DC 711. See, Exhibit 1, ¶3; Exhibit 2. The Agreement identifies the Union as "the exclusive bargaining agent for all employees doing work covered in the work jurisdiction defined in 2.2" of the Agreement. See, Exhibit 2, Art. 1, Sec. 1.1.

At all times relevant to this action, Defendant also signed or agreed to abide by the terms of the agreement and declaration of trust of the Fund ("Trust Agreement") made between certain employers and employee representatives in an industry(ies) affecting interstate commerce to promote stable and peaceful labor relations and the International Painters and Allied Trades Industry Pension Plan ("Plan") (f/k/a the Pension Fund's Rules and Regulations). See, Complaint, ¶7; Exhibit 2, Art. 10, Sec. 10.3. A true and correct copy of the Trust Agreement is attached to the Pension Fund's Complaint as Exhibit 1 and incorporated by reference. A true and correct copy of Section 10.12 of the Plan is attached to the Pension Fund's Complaint as Exhibit 2 and incorporated by reference.

The collective bargaining agreement, Trust Agreement and Plan require Defendant to submit monthly contributions to the Pension Fund on behalf of all employees in the bargaining unit. See, Exhibit 1, ¶4; Exhibit. 2, Art. 10, Sec. 10.3; Complaint, ¶8; Complaint, Exhibit. 1, pp.15-16 (Art.VI, §2). Contributions must be made for each hour for which any employee receives pay at the contribution rate specified in the agreement. Id. Failure to make the required contributions, or the

---

[1]  The exhibits referenced in the Montemore Declaration are attached as Exhibits 2 through 4.

submission of either incorrect or late remittance reports and contributions, results in a delinquency to the Pension Fund. See, Exhibit 1, ¶4.

As part of their obligation to the Pension Fund that they administer, the Trustees are empowered to perform periodic audits on each and every signatory employer, in order to ascertain the employer's compliance with the applicable collective bargaining agreement. See, Complaint, Exhibit 1, pp.16-17 (Art. VI, §6). In relevant part, the Trust Agreement states:

> The Trustees may at any time have an audit made by certified public accountants of the payroll, wage and cash disbursement records, general ledger, and other financial records, including but not limited to tax returns, of any Employer in connection with the said contributions and/or reports...Any Employer found to be delinquent or in violation of the Rules and Regulations of the Pension Plan and/or Annuity Plan as a result of an audit may be required by the Trustees to pay to the Fund the cost of the audit.

Id.

Pursuant to this power, the Pension Fund instructed the public accounting firm of Moore, Renner & Simonin, P.C. to conduct a contribution compliance payroll audit of the Defendant. See, Declaration of Robert E. Moore, CPA[2], ¶3, attached as Exhibit 5. The audit was conducted on June 2, 2005 for the period January 1, 2001 through March 31, 2005 and revealed a delinquency in the amount of $32,007.98 resulting from the hours worked by a nonunion painter and the use of a non-signatory subcontractor to perform bargaining unit work. Id.; see also, Audit, attached as Exhibit 6.

With regard to the payment of contributions, the Agreement provides:

10.3  International Union of Painters and Allied Trades Union and Pension Fund.

> The only agreement between the employer(s) and the Union parties to this Agreement regarding pensions or retirement for **employees** covered by this Agreement is as follows:

> 1.    (A)    Commencing with the first day of May, 2000, and for the

---

[2] The exhibit referenced in the Moore Declaration is attached as Exhibit 6.

duration of the Agreement, and nay renewals or extension thereof, the employer agrees to make payments to the IUPAT Union and Industry Pension Fund for **each employee** covered by this Agreement, as follows:

(B)    For each hour or portion thereof for which **an employee** receives pay, the employer shall make a contribution of in the amount indicated in the 6.4 charts to the above named pension fund; allocations to the IUPAT Union and Industry Pension Plan and to the IUPAT Union and Industry Annuity Plan shall be indicated in said charts.

(C)    For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable.

(D)    Contributions shall be paid on behalf of **any employee** starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, apprentices, helpers, trainees, and probationary employees.

(E)    The payments to the Pension Fund required above shall be made to the IUPAT Union and Industry Pension Fund, which was established April 1, 1967. The employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as amended from time to time, as though he had actually signed the same.

See, Exhibit 2, Art. 10, Sec. 10.3 (emphasis added).

As stated in the Agreement, contributions must be paid on behalf any employee performing the following types of painting:

All painting of residences, buildings, structures, industrial plants, tanks, vats, pipes, vessels, bridges, light poles, high tension poles, traffic and parking lines on highways, parking lots, playgrounds, factories, and airline strips; all sign, pictorial, coach, car, automobile, carriage aircraft, machinery, ship and railroad equipment, mural and scenic painting, spackling of all surfaces where adhesive materials are used; and all drywall pointing, taping and finishing.

See, Exhibit 2, Art. 2, Sec. 2.2(A).

Further, the Agreement broadly covers a wide range of employees. The Agreement specifically establishes its jurisdiction over the following types of employees:

(B) All decorators, paperhangers, hard wood finishers, grainers, glaziers, architectural metal and glass workers, varnishers, enamelers, gliders and drywall finishers.

(C)    All persons engaged in applying or removing paints, pigments, extenders, metal primers and metal pigments, clear pigments, binders, thinners and dryers, primers and sealers, oil paints and enamels, chemical and epoxy coatings, water colors and emulsions clear coatings, waxes, stains, mastics, cement enamels and other special coatings, plastics, adhesives, coating and sweet rubber and other linings, oils, varnishers, water colors, wall paper, wall coverings, decorative textures or all surfaces, foams, seamless and tile-like coatings or other materials used in the various branches of the trade, and the cleaning and beaching of all interior, and exterior walls and surfaces with liquid steam, sandblast, waterblast or any other process.

(D)    Glaziers, Architectural Metal and Glass Workers:  General Glazing will include, but not be limited to: (1) the installation, setting, cutting, preparing, fabricating, distributing, handling or removal of the following: art glass, prism glass, beveled glass, leaded glass, automotive glass, protection glass, plate glass, window glass, colored glass, figured glass, vitrolite glass, carrara glass, all types of opaque glass, glass chalk boards, structural glass, curtainwall systems, louvers, tempered and laminated glass, Thiokol, neoprene, all types of insulating glass units, all plastics or other similar materials when used in place of glass to be set or glazed in its final resting place with or without putty, vinyl, molding, rubber, lead, sealants, silicone and all types of mastics in wood, iron, aluminum, sheet metal or vinyl sash, skylights, doors, frames, stone wall cases, show cases, book cases, side-boards, partitions and fixtures; (2) the installation of the above materials when in the shop or on the job site, either temporary or permanent, on or for any building in the course of repair, removal, alteration, retrofit or construction; (3)  the installation of and welding of all extruded, rolled or fabricated materials including, but not limited to, all metals, plastics and vinyls, or any materials that replace same, metal and vinyl tubes, mullians, metal facing materials, corrugated flat metals, aluminum panels, muntins, facia, trim moldings, porcelain panels, architectural porcelain, plastic panels, unitized panels, skylights, showcase doors, all  handrails and relative materials, including those in any or all types of building related to store front, door/window construction and curtain wall systems; (4) the installation of automatic door entrances, door(s) and window(s) frame assemblers such as patio, sliding or fixed doors, vended or fixed windows, shower doors, bathtub enclosures, storm sash where the glass becomes an integral part of the finished product, including the maintenance of all the above; (5) bevellers, silverers, scratch polishers, abrasive blasters, flat glass wheel cutting, mitre cutters, engragers, hole drilling, machine operations, belt machines, and all machines used in the processing of glass, automatic beveling, silvering, grinding, polishing, unpacking and racking of glass, packing glass, glass cleaners in shops, mirror cleaning, assembling, framing and fabrication and assembling of all insulated and non-insulated units, fabrication and mounting

of mirrors and the operations of all machines and equipment for these operations; (6) the selecting, cutting, preparing, designing, art painting, and installing or removal of all art glass, engraving, drafting, etching, embossing, designing, drafting, abrasive blasting, chipping, glass bending, glass mosaic workers, cutters of all flat and bent glass; glass shade workers, and glaziers in lead or other glass metals; the fabrication and distribution of all glass and glass-related products; (7) any and all transportation, handling, unloading and loading of tools, equipment and materials will be performed by members of this International Union.

See, Exhibit 2, Art. 2, Sec. 2.2(B)-(D).

The Agreement also claims jurisdiction over paintmakers[3], sign and display workers[4], display convention and show decorators[5], scenic artists[6] and any work including the operation of all tools, equipment and machinery used by all trades coming under the Union's jurisdiction.[7]

In addition to the delinquencies based on unreported hours worked by certain individuals employed by Troast, the audit also revealed that a portion of the delinquency results from Company's use of a non-signatory subcontractor. See, Exhibit 6. The Agreement specifically forbids subcontracting "except to signatory contractors whose employees receive comparable wages, hours or work and working conditions." See, Exhibit 2, Art. 15, Sec. 15.1. Nevertheless, Troast employed 1st Call Ptg. which, according to the Fund's records, is not a signatory company. See, Exhibit 1, ¶6; Exhibit 5, ¶3; Exhibit 6.

In a letter dated July 21, 2005, Gary Meyers, the Fund Administrator, informed Company of the audit findings, and set a deadline of August 1, 2005 for Company to pay the outstanding contributions, interest and liquidated damages in the amount of $54,608.63 ("Total") in full. See, Exhibit 1, ¶7; see also, Exhibit 3. Mr. Meyers also gave Company the opportunity to rebut the

---

[3] Id. at Sec. 2.2(E).
[4] Id. at Sec. 2.2(F).
[5] Id. at Sec. 2.2(G).
[6] Id. at Sec. 2.2(H).
[7] See, Exhibit 2, Art. 2, Sec. 2.2(I).

audit, which required payment at least in the amount of fifty percent (50%) of the Total as well as documentation to support its rebuttal. Id. On August 9, 2005, Company responded to the July 21, 2005 letter without fifty percent (50%) of the Total, and without documentation supporting the rebuttal. See, Exhibit 1, ¶8; see also, Exhibit 4. The Pension Fund responded by filing suit against Company on August 19, 2005 seeking all amounts found to be due and owing, including interest, liquidated damages, late fees, the cost of audit and attorneys' fees and costs. See, Complaint.

The Complaint was served on Defendant on August 29, 2005. See, Affidavit of Service. On September 12, 2005, James Lawler, Esquire of the law firm Wollmuth Maher & Deutsch LLP contacted Shanna M. Cramer, Esquire, an associate with the law firm of Jennings Sigmond, P.C., to discuss the details of the instant matter. See, Declaration of Shanna Cramer, Esquire[8], ¶¶1-2, attached as Exhibit 7. On September 29, 2005, the parties stipulated to extend time to answer the Complaint to October 10, 2005. Id., at ¶3. On October 11, 2005, Mr. Lawler request an informal extension for one week and Ms. Cramer agreed to the extension. Id. at ¶4. On October 18, 2005, opposing counsel filed the Answer. Id. at ¶5. However, on October 21, 2005, the Court deleted Defendant's Answer because Paul R. DeFilippo, Esquire, the attorney who filed the Answer on behalf of Defendant, was not a member in good standing with the United States District Court for the District of Columbia. Id. at ¶6. Upon receipt of the email notification from the Clerk that the Answer was deleted, Ms. Cramer immediately called Mr. Lawler and left a message regarding the invalid Answer. Id. at ¶7. Ms. Cramer also followed up with an email. Id. Mr. Lawler failed to return either the telephone call or the email and on October 24, 2005, counsel for Plaintiff filed the Request for Entry of Default pursuant to Federal Rule of Civil Procedure 55(a).

Id. at ¶8.  The Clerk entered default on October 25, 2005 and on November 10, 2005, counsel

for Plaintiff filed the Motion for Default Judgment pursuant to Federal Rule of Civil Procedure

55(b).  Id. at ¶9.  On November 21, 2005, the Court granted Default Judgment and on November

28, 2005, Ms. Cramer faxed and sent by regular mail a copy of the Default Judgment and

requested immediate payment.  Id. at ¶10;  see also, Exhibit 8.

Jeffrey Karlin, Esquire, Defendant's new counsel, contacted Ms. Cramer on December 7,

2005 to advise of his client's intention to file its Motion to Re-Open and Motion to Vacate

Default Judgment.  Id. at ¶11. The Motions were subsequently filed on December 9, 2005.  Id.

On December 13, 2005, Ms. Cramer advised Mr. Karlin that his client could submit supporting

documentation regarding the proper classification for any employee or sub-contractor which

Defendant claimed to be improperly included in the audit. Id. at ¶12.  Defendant has failed to

submit such documentation.  Id. at ¶13.

## II.    ARGUMENT

In making a determination whether to vacate default judgment under Rule 60(b), courts

consider and balance several factors in determining whether to grant relief from the entry of default

judgment.  These factors include:

- whether the defendant has a meritorious defense;

- whether the default was the result of the defendant's willful conduct; and

- whether the plaintiff will be prejudiced if the default is lifted.

See, Jackson v. Beech, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting Keegel v. Key West &

Carribbean Trading Co., 627 F.2d 372, 374 (D.C. Cir. 1980) (citing Fed. R. Civ. P. 55(c) ("Rule

55(c)")).  While it is important for cases to be resolved on their merits, it is within the court's

---

[8] The exhibit referenced in the Cramer Declaration is attached as Exhibit 8.

sound discretion to grant relief under Rule 60(b)(1).  Id.

### A.    Defendant has Not Presented a Meritorious Defense and Default Judgment Should Not be Vacated.

Courts require that a movant under Rule 60(b) assume the burden of showing a meritorious defense against the claim on which judgment was entered as a threshold condition to any relief whatsoever under the Rule.  See, Compton v. Alton Steamship Company, Inc., 608 F. 2d 96, 102 (1969).  Thus, even if Troast can show excusable neglect, lack of prejudice or any other of the six grounds itemized in the Rule[9], Defendant simply does not proffer a meritorious defense which, if proven, would absolve Company of its liability to the Pension Fund.  As a result, there is basis to vacate the Default Judgment entered by this Court on November 21, 2005.

To demonstrate the existence of a meritorious defense, the Defendant must set out more than mere general denials or conclusory statements that a defense exists.  Whitaker v. District of Columbia, 228 F.R.D.378, 381 (D.D.C. 2005) (general denial insufficient to establish meritorious defense).  This Court has held that a defense is meritorious if it contains "even a hint of a suggestion" which, if established at trial, would be a complete defense.  See, Harris v. District of Columbia, 159 F.R.D. 315,317 (D.D.C. 1995); International Painters and Allied Trades Union and Industry Pension Fund v. H.W. Ellis Painting, Co., Inc., 288 F.Supp.2d 22, 28 (D.D.C. 2003).  Here, there exists absolutely no nit of a suggestion that Defendant would prevail on any of its proffered defenses.  The facts and law in this case simply do not support Defendant's claims of a meritorious defense.

---

[9] Rule 60(b) identifies a total of six reasons to allow relief from judgment: (1) mistake, inadvertence, surprise, or excusable neglect, or (2) newly discovered evidence, or (3) fraud, misrepresentation or other misconduct, or (4) the judgment is void, or (5) either (a) the judgment was satisfied, (b) the judgment has been released or discharged, (c) a prior judgment, upon which the judgment is based, is reversed, or (d) it is no longer equitable that the judgment should have prospective application, or (6) there exists any other reason justifying the relief from the operation of the judgment.

Defendant relies exclusively on the bland, generic affirmative defenses pled in its answer as evidence of a meritorious defense. Rather than present facts, the affirmative defenses simply state conclusions.

### 1.    Defendant's First Affirmative Defense is an Improperly Pled Defense

Defendant's First Affirmative defense is a disguised claim under Fed.R.Civ.Pro. 12(b)(6). This claim has no basis and should be ignored. Plaintiff has clearly alleged all facts necessary to prevail on the claim for delinquent contributions.

A party alleging a breach of contract satisfies its pleading requirement demonstrates the existence of the contract, breach thereof and resultant damage. In re: U.S. Office Products Co., 251 F. Supp. 2d 77, 93 (D.D.C. 2003) (citing Winston v. Mandor, 710 A.2d 835, 840 (Del. Ch. 1997)). Here, the Pension Fund has clearly alleged all facts necessary to prevail on its claim for payments owed under the collective bargaining agreement to which Defendant is bound, the Trust Agreement and the Plan. Pursuant to the Trust Agreement, Plan and collective bargaining agreement, Defendant is clearly obligated (a) to make full and timely payments on a monthly basis to the Pension Fund (See, Complaint, Exhibit 1, pp.15-16 (Art.VI, §2)); (b) to file monthly remittance reports with the Pension Fund detailing all employees or work for which contributions and work dues were required (See, Complaint, Exhibit 1, p.16 (Art.VI, §§3,5)); (c) to produce, upon request by the Pension Fund all books and records deemed necessary to conduct an audit of Defendant's records concerning its obligations to the Pension Fund (See, Complaint, Exhibit 1, pp.16-17 (Art.VI, §6)); and (d) to pay liquidated damages and costs of litigation, including attorneys' fees, expended by the Pension Fund to collect any amounts due as a consequence of Defendant's failure to comply with its contractual obligations described in (a), (b) and (c). See, Complaint, Exhibit 1, p. 16-17 (Art.VI, §§4,6); Complaint, Exhibit 2, § 10.12.

The Pension Fund argues that Defendant has breached these binding contracts by failing to pay required remittances for all employees performing bargaining unit work. Additionally, Plaintiff argues that Company violated its duties under the Agreement as a result of employing nonunion subcontractors. The damages flowing therefrom are the monies not received by the Pension Fund, the liquidated damages and costs of litigation, including attorneys' fees, expended by the Pension Fund to collect any amounts due as a consequence of Defendant's failure to comply with its contractual obligations and the inability to audit Defendant's records to correctly determine the exact amount owed to the Pension Fund. Clearly here, the Pension Fund has met its burden of stating a claim.

The Pension Fund has also stated a claim under ERISA. Pursuant to 29 U.S.C. §1145, "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." By agreeing to abide by the Trust Agreements or collective bargaining agreement, Defendant obligated itself to make monthly contributions under 29 U.S.C. §1145. In its Complaint, the Pension Fund argues that Defendant has failed to make such payments as required by 29 U.S.C. §1145. Accordingly, the Pension Fund seeks monetary damages. Therefore, again, the Pension Fund has met its burden of stating a claim.

Accordingly, the Pension Fund has properly pled a claim upon which relief can be granted, rendering Defendant's defense here anything but meritorious.

2.    **Defendant's Second, Third, Sixth, Seventh, Eighth, Ninth, Eleventh and Fifteenth Affirmative Defenses are Not Meritorious and do Not Support a Finding to Vacate Default Judgment**

a. **Defendant's Second Affirmative Defense:  Plaintiff's Claims are Time-barred and/or have Lapsed**

In bringing a delinquency claim under Section 515 of ERISA, 29 U.S.C. § 1145, the action is considered a straightforward breach of contract suit.  Because ERISA provides for no specific statute of limitations, a court is required to borrow a limitations period from the most closely analogous state cause of action.  Grant v. U.S. News and World Report, Inc., 639 F.Supp. 342, 347 (D.D.C. 1986)(citing, Foltz v. U.S. News and World Report, Inc. 627 F.Supp. 1143, 1149 (D.D.C. 1986)(applying the District of Columbia limitations period for contract actions in an ERISA matter)).  The District of Columbia limitations period for actions upon a simple contract is three (3) years.  DC ST § 12-201 (7).

Courts have expressly recognized that a limitations period does not begin to run until the delinquency is discovered.  Trustees of National Automatic Sprinkler Pension Fund v. American Automatic Fire Protection, 680 F.Supp. 731 (D. Md. 1988)(holding statute does not begin to run until trust knew or should have known of delinquency).  In the current case, the Pension Fund did not know of Defendant's delinquency until the audit results were revealed, which was on or about June 2, 2005.  This action was filed on August 19, 2005, within a few months of the discovery of the delinquency, clearly within the applicable limitations period.  Therefore, the defense that this action is barred by the applicable statutory of limitations is invalid.

b. **Defendant's Third Affirmative Defense:  Plaintiff Lacks Standing.**

Trusts are considered to be in the nature of third-party beneficiaries of the collective

bargaining agreement and, collectively, the trustees may maintain actions to collect delinquencies. See, Sheriff v. Medel Elec. Co., 412 A. 2d 38,43 (D.C. 1980); Robbins v. Lynch, 836 F.2d 330 (7th Cir.1988); see also, Central States, Southeast & Southwest Areas Pension Fund, v. Behnke, Inc., 883 F.2d 454 (6th Cir. 1989). Furthermore, Section 502 or ERISA confirms that a trust may sue in its own name.

### c. Defendant's Sixth and Seventh Affirmative Defenses: Plaintiff's Causes of Action are Barred by Res Judicata and Collateral Estoppel, Respectively.

The doctrine of res judicata prevents repetitious litigation involving the same causes of action or the same issues. I.A.M. Nat. Pension Fund, Ben. Plan A v. Industrial Gear Mfg. Co., 723 F.2d 944, 946 (D.C.C. 1983). The doctrine usually is parsed into claim preclusion and issue preclusion. Id. Under the claim preclusion aspect of res judicata, a final judgment on the merits in a prior suit involving the same parties or their privies bars subsequent suits based on the same cause of action. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979). Under the issue preclusion aspect of res judicata, a final judgment on the merits in a prior suit precludes subsequent relitigation of issues actually litigated and determined in the prior suit, regardless of whether the subsequent suit is based on the same cause of action. Id. These defenses are completely invalid as the parties in this action have never been involved in any other lawsuit with one another.

### d. Defendant's Eighth and Ninth Affirmative Defenses: Plaintiff's Causes of Action are Barred by Judicial Estoppel and Equitable Estoppel, Respectively.

Neither equitable nor judicial estoppel requires prior litigation of the issue in question, merely prior judicial acceptance of factual assertion made by a party who now advances inconsistent contention. Konstantinidis v. Chen, 626 F.2d 933, 937 (D.C 1980). In order for equitable estoppel to

apply against a party to litigation, that party must have asserted, successfully, one position in litigation, and then switched his position after the other party has relied thereon to his detriment. Hudson v. Ashley, 411 A.2d 963 (D.C. 1980).

In contrast to equitable estoppel's concentration on the integrity of the parties' relationship to each other, judicial estoppel focuses on the integrity of the judicial process. Konstantinidis, 626 F. 2d at 937. To the extent that prior sworn statements are involved, the doctrine upholds the "public policy which exalts the sanctity of the oath. The object is to safeguard the administration of justice by placing a restraint upon the tendency to reckless and false swearing and thereby preserve the public confidence in the purity and efficiency of judicial proceedings." Id. (citing Melton v. Anderson, 32 Tenn.App. 335, 339 (Ct.App.1948)). Furthermore, even when the prior statements were not made under oath, the doctrine may be invoked to prevent a party from playing " 'fast and loose with the courts.'" See, Scarano v. Central Railroad, 203 F.2d 510, 513 (3d Cir. 1953).

### e.   Defendant's Eleventh Affirmative Defense:  Plaintiff is Barred from Asserting Claims against Defendant which have already been Released or Otherwise Waived.

At no point did the Pension Fund ever release Company from its obligation. Furthermore, there was never any waiver of the obligation. As explained above, the Pension Fund became aware of Company's delinquencies in June 2, 2005. Once detected, the Pension Fund immediately sought payment from Defendant.   When the Pension Fund determined that payment would not be forthcoming, this suit was brought against Defendant. This defense is completely invalid. Furthermore, it is misleading and unsupported by the facts in this case

> **f.  Defendant's Fifteenth Affirmative Defense:  Plaintiff's Action is Barred by Mandatory Arbitration and/or Mediation Provisions.**

This alleged defense ignores completely <u>Schneider Moving & Storage Company v. Robbins</u>, 466 U.S. 364, 104 S.Ct. 1844, 1847 (1984), in which the U.S. Supreme Court held that trustees of employee benefit plans were not required to submit delinquency disputes through grievance/arbitration provisions in a collective bargaining agreement.

> **3.  <u>Defendant's Fourth, Fifth, Tenth, Twelfth, Thirteenth and Fourteenth Affirmative Defenses are Bland, Generic and Generally Misapplied.</u>**

Defendant has interposed its Affirmative Defenses in such bland, generic terms such that the Pension Fund cannot possibly respond or properly prepare for litigation.  Moreover, many of the arcane common law defenses asserted by Defendant are misapplied based on the facts of this particular case.

> **a.  Defendant's Fourth Affirmative Defense: Plaintiff's Action is Barred by the Doctrine of Laches**

Laches is an equitable doctrine, designed to serve the maxim that "equity aids the vigilant, not those who slumber on their rights." <u>Independent Bankers Ass'n v. Heimann</u>, 627 F.2d 486, 488 (D.C.C.1980). By preventing the enforcement of stale claims, the doctrine obligates litigants to pursue their rights expeditiously. <u>See</u>, <u>NAACP v. NAACP Legal Def. & Educ. Fund, Inc.</u>, 753 F.2d 131, 137 (D.C.C.1985). Courts have identified two preconditions for any laches defense: "a claim will not be barred under that doctrine unless it is shown that the party raising the defense was prejudiced by the other party's delay in raising the claim and that the delay was unreasonable." <u>See</u>, <u>Burka v. Aetna Life Ins. Co.</u>, 56 F.3d 1509, 1514 (D.C.C.1995). In the case at bar, there was no delay in the filing of suit.  This defense is simply

not supported by the facts.

### b. Defendant's Fifth Affirmative Defense: Plaintiff's Action is Barred by the Doctrines of In Pari Delicto and Unclean Hands

This line of defense "deals generally with parties whose equal, mutual, and simultaneous fault casts them in the role of joint conspirators." Lawler v. Gilliam, 569 F.2d 1283, 1292 (4th Cir.1978). The parties in this case are not in the role of joint conspirators. The Pension Fund could not even begin to address the merits of this defense because there has been no fault on the part of the Pension Fund in this action. Troast failed to comply with the terms of the Agreement and the Pension Fund filed suit seeking the contractual contributions due under the Agreement. Furthermore, outside of this Affirmative Defense, Defendant does not claim any wrongdoing on the part of the Pension Fund. This defense simply has no merit.

### c. Defendant's Tenth Affirmative Defense:  Plaintiff's Action is Barred by the One-Satisfaction Rule

Under the "one satisfaction rule," a party may only recover once for an injury. Where there has been only one injury, the law confers only one recovery, irrespective of the multiplicity of parties whom or theories which the plaintiff pursues. Kassman v. American University, 546 F.2d 1029 (D.C.Cir. 1976). The Pension Fund is not greedy. It is seeking only to recover the outstanding contributions which Defendant failed to pay under the Agreement. On November 21, 2005, this Court entered Judgment in favor of the Pension Fund for the total amount of outstanding contributions found to be due, liquidated damages, interest, late fees and attorneys' fees and costs. That Judgment fulfills the one-satisfaction rule, and it should not be vacated.

### d. Defendant's Twelfth Affirmative Defense: Plaintiff's Action is Subject to Set Off and/or Recoupment

The concepts of recoupment and setoff are procedural devices by which a defendant seeks

to reduce the amount he owes to a plaintiff by the value of the plaintiff's cross-obligations to the

defendant. Nashville Lodging Co. v. Resolution Trust Corp,. 59 F.3d 236, 246 (D.C.Cir. 1995).

These terms differ in that recoupment involves the balancing of reciprocal obligations incurred as

part of a single transaction, while setoff refers to the balancing of obligations that the parties

incurred in wholly separate transactions. Id. In this instance, there is no issue of "reciprocal

obligations." Troast failed to pay the requisite contributions, and the Pension Fund is seeking

recovery of those amounts. Furthermore, outside of this Affirmative Defense, Defendant does

not claim that the Pension Fund owes Troast any money, nor does it argue that it has paid in

excess of is obligation. This defense, as well as all the others, is without merit.

### e.  Defendant's Thirteenth Affirmative Defense:  Plaintiff is Barred from Bringing this Action because it Breached the Implied Covenant of Good Faith and Fair Dealing

In every contract there is an implied covenant that neither party shall do anything which

will have the effect of destroying or injuring the right of the other party to receive the fruits of the

contract, which means that in every contract there exists an implied covenant of good faith and

fair dealing.'" Uproar v. National Broadcasting Co., 81 F.2d 373, 377 (1st Cir.), cert. denied, 298

U.S. 670, 56 S.Ct. 835, 80 L.Ed. 1393 (1936). This duty prevents a party from evading the spirit

of the contract, willfully rendering imperfect performance or interfering with the other party's

performance. Hais v. Smith, 547 A.2d 986, 988 (D.C.C. 1988).

### f.  Defendant's Fourteenth Affirmative Defense:  Plaintiff has No Contractual Right to Payment

In this defense, Company asserts that the Pension Fund has no right to payment.

Nevertheless, the Defendant does not deny that it is signatory to the Agreement. See, Exhibit 2;

Defendant's Verified Answer, ¶6. Under the Agreement, an employer is required to pay

contributions on behalf of all employees. <u>See</u>, Exhibit 2, Art. 10, Sec. 10.3. The audit revealed that contributions were not made on behalf of all employees. <u>See</u>, Exhibit 6.

### 4. <u>Defendant's Defense that the Audit Delinquencies are Based on Non-Union Employees is Insufficient to Support a Find to Vacate Default Judgment.</u>

In addition to the generic laundry list of affirmative defenses pled by the Defendant, Defendant also asserts as a defense that none of the employees at issue were "either members of the union at issue or even eligible to become members." Defendant's Motion to Vacate Default Judgment, ¶4. The defense, however, fails to consider the express provisions under the Agreement, which shows that it applies to all of Company's employees, union and non-union, who perform work covered by the Agreement (i.e. "bargaining unit work").

An employer's, such as the Company's, attempt to limit application of the terms of the Agreement (here, the obligation to pay contributions to the Pension Fund) to only employees who are members of the union, constitutes unlawful discrimination in violation of §8(a)(3) of the National Labor Relations Act. 29 U.S.C. §158(a)(3).

Defendant has contested the audit findings but has not submitted any documentation to support its position. Such documentation could have the effect of reducing the delinquency. Defendant has been aware of the audit findings since July 2005, and has been unable or unwilling to produce documentation regarding its dispute. Vacating the judgment in this case will only have the effect of delaying the collection of outstanding contributions owed to the Pension Fund. If Company has been unable to produce evidence in support of its position within the last five (5) months, it is unlikely that more time will reveal such evidence.

5.     **There are Only Three Valid Defenses to a Suit for the Collection of Delinquency Contributions under ERISA and Defendant Fails to Assert any of them.**

Congress enacted section 515 of the Employee Retirement Income Security Act ("ERISA") because the cost to plans of employer delinquency "detract[ed] from the ability of plans to formulate or meet funding standards and adversely affect[ed] the financial health of plans" and because "[re]course available under current law for collecting delinquent contributions [was] insufficient and unnecessarily cumbersome and costly." See, Agathos v. Starlite Motel, 977 F.2d 1500,1505 (1992) (citing 126 Cong.Rec. 23039 (1980) (remarks of Rep. Thompson); 29 U.S.C. §1145.  Section 515 was designed to permit trustees of plans to recover delinquent contributions efficaciously.  Id. To that end, courts recognize only three defenses that may be asserted by an employer against employee benefit trust funds:  (1) the [fund] contributions themselves are illegal; (2) the collective bargaining agreement is void *ab initio*, as where there is fraud in the execution of the agreement, and not merely voidable, as in the case of fraudulent inducement; and (3) the employees have voted to decertify the union as its bargaining representative, thus prospectively voiding the union's collective bargaining agreement.  Agathos, 977 F. 2d 1500, 1505 (citing Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 86, 102 S.Ct. 851, 861 (1982); Southwest Adm'rs, Inc. v. Rozay's Transfer, 791 F.2d 769, 773 (9th Cir.1986), cert. denied, 479 U. S. 1065, 107 S.Ct. 951 (1987); Sheet Metal Workers' Int'l Ass'n, Local 206 v. West Coast Sheet Metal Co., 954 F.2d 1506, 1509 (9th Cir. 1992)).

In the case at bar, Defendant has failed to assert any of the three valid defenses and there is no basis to vacate the default.

## B.    Prejudice to the Pension Fund

Defendant has presented no real facts or evidence to support its position that the Pension

Fund will not be prejudiced if the default is set aside and a final decision in this matter further

delayed. Ultimate collectibility of contributions from a delinquent employer is always a problem.

See, e.g. Huge v. Long's Hauling Company, 590 F.2d 457, 465 n.11 (3d Cir. 1978) (granting

preliminary injunction to avoid potentially uncollectible judgment as a result of dissipation of assets

during proceeding). The likelihood of successful recovery diminishes rapidly with the passage of

time as assets disappear. Thus, the need to have these types of actions resolved quickly and in the

most efficient manner was the impetus behind the adoption of Section 515 of ERISA and the

substantial limitations placed on employer defenses by the courts. Since the defenses alleged by

Defendant have no support in the facts or law and will not result in any different outcome, setting

aside the default and, thus, delaying the entry of judgment at additional expense to the Pension Fund

will cause the Pension Fund substantial prejudice.

## C.    Defendant Has not Demonstrated Excusable Neglect [10]

Default judgment must normally be viewed as available only when the adversary process

has been halted because of an essentially unresponsive party. See, H. F. Livermore Corp. v.

Aktiengesellschaft Gebruder Loepfe, 432 F.2d 689, 691 (D.C. Cir. 1970). In that instance, the

diligent party must be protected lest he be faced with interminable delay and continued

uncertainty as to his rights. Id.

---

[10] Nowhere in its Motion does Defendant argue that its failure to make a timely pleading was a result of inadvertence or surprise.
Accordingly, these defense are waived. See, In re Worldwide Web Sys., Inc., 328 F.3d 1291 (11th Cir. 2003); Ladder Man, Inc. v.
Manufacturer's Distribution Svcs. Inc., 2000 U.S. App. LEXIS 27982 (6th Cir. 2000). However, in the event that the Court allows
Defendant to raise any one of these defenses in a future pleading, the Pension Fund reserves the right to raise its defenses or otherwise
respond accordingly.

Courts are supposed to construe liberally the requirements of Rule 60(b) when reviewing any order "which abridged the adversary process", whether or not it is a default judgment. Holliday v. Duo-Fast Maryland Co., 905 F2d 1525 (4th Cir. 1990), (citing Solorall Shade and Shutter Corp., v. Bio-Energy Systems, Inc., 803 F.2d 1130, 1133 (11th Cir. 1986)). In Solaroll Shade, plaintiff, Solaroll filed a motion to reinstate an action and enforce a settlement agreement. 803 F. 2d 1130, 1131. Counsel for defendant, Bio-Energy, received a service copy of the motion and promised to forward a proposed stipulation and settlement proposal to plaintiff's counsel. Id. Shortly thereafter, Bio-Energy requested an extension. Id. Solaroll never received the proposed stipulation or settlement. Id. Furthermore, Bio-Energy "simply forgot to respond." Id. at 1132. Consequently, the district court granted Solaroll's unopposed motion and entered the order submitted with the motion. Id. Bio-Energy filed a motion to vacate the judgment pursuant to Rule 60(b).

Upon review of the lower court's determination, the Eleventh Circuit determined that the district court did not abuse its discretion when it denied Bio-Energy's motion to vacate judgment. In denying Bio-Energy's motion, the lower court was not penalizing Bio-Energy's counsel's failure to respond to Solaroll's motion. Id. at 1133. Instead, the court was duly deciding on a motion to which Bio-Energy's counsel failed to respond. Id. Such an order does not abbreviate the adversary process. Rather, it prevents a party's negligence from unduly extending that process." Id. Furthermore, because Bio-Energy failed to demonstrate a meritorious defense, a requirement under Rule 60(b), the court denied the motion to vacate judgment. Id.

Similar to the facts in Solaroll Shade, the Court in the case at bar granted the Pension Fund's uncontested Motion for Default Judgment and entered the Order submitted with the Motion. As in Solaroll Shade, the Order in this instance does not "abbreviate the adversary

process." Instead, it protects the Pension Fund from unduly extending the litigation process.
Nevertheless, even if this Court were to hold that excusable neglect exists, Troast fails to assert
even one meritorious defense and the Company's Motion to Vacate Default Judgment should be
denied.

## III. CONCLUSION

Based on the foregoing, Defendant has failed to establish that it has any defense to this
action which has any merit or even the slightest chance of success. Absent such a defense, there
is no basis to vacate the default and the Pension Fund asks that the Court deny Defendant's
request to vacate the default judgment entered in favor of the Pension Fund.

Respectfully submitted,

JENNINGS SIGMOND, P.C.

BY: /s/Sanford G. Rosenthal
    SANFORD G. ROSENTHAL (ID.NO. 478737)
    The Penn Mutual Towers, 16th Floor
    510 Walnut Street, Independence Square
    Philadelphia, PA 19106-3683
    (215) 351-0611
Date: December 22, 2005    Attorneys for the Pension Fund